1  ALEXANDER R. BILUS (*pro hac vice* forthcoming)
   alexander.bilus@saul.com
2  MATTHEW J. SMITH (*pro hac vice* forthcoming)
   matthew.smith@saul.com
3  DANA M. SILVA (BAR NO. 271920)
   dana.silva@saul.com
4  SAUL EWING LLP
5  1888 Century Park East, Suite 1500
   Los Angeles, California 90067
6  Telephone:  (310) 255-6100
   Facsimile:  (310) 255-6200
7

8  Attorneys for Specially Appearing Defendant
   THE PENNSYLVANIA STATE UNIVERSITY
9

10              **UNITED STATES DISTRICT COURT**

11       **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

12

13  DONALD G. ABBEY, an individual,          Case No. 8:24-cv-01217

14              Plaintiff,                    **SPECIALLY APPEARING DEFENDANT
                                              THE PENNSYLVANIA STATE
15       v.                                   UNIVERSITY'S NOTICE OF REMOVAL
                                              OF ACTION**
16  THE PENNSYLVANIA STATE
    UNIVERSITY, a Pennsylvania nonprofit     Removed from:
17  corporation; and DOES 1-50, inclusive,   Superior Court of the State of California in the
                                             County of Orange, Case Number: 30-2024-
18              Defendants.                   01392676-CU-FR-NJC

19

20       **TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

21       **PLEASE TAKE NOTICE** that Specially Appearing Defendant THE PENNSYLVANIA

22  STATE UNIVERSITY ("Defendant") hereby removes to this Court the state court action

23  described below.

24       1.      On April 9, 2024, an action was commenced in the Superior Court of the State of

25  California in the County of Orange, entitled DONALD G. ABBEY, Plaintiff, vs. THE

26  PENNSYLVANIA STATE UNIVERSITY, a Pennsylvania nonprofit corporation; and DOES 1-

27  50, inclusive, Defendants, as Case Number: 30-2024-01392676-CU-FR-NJC (the "State Court

28  Action"). A copy of the Complaint is attached hereto as **Exhibit 1**.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2.      Without waiving any defenses, including a lack of personal jurisdiction, Defendant accepted service on May 8, 2024, via an executed Notice and Acknowledgement of Receipt.

**Removal is Proper Because This Court Has Subject Matter Jurisdiction Pursuant To 28 U.S.C. §§ 1332 and 28 U.S.C. § 1441(b)**

3.      This is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1441(b), in that it is a civil action between citizens of different states and the matter in controversy as alleged by Plaintiff exceeds the sum of $75,000, exclusive of interests and costs.

4.      Complete diversity of citizenship exists. Plaintiff, at all relevant times, was and is an individual with a principal place of business located at 12447 Lewis Street, Suite 2013, Garden Grove, California, which is located in Orange County, California. *See, e.g.*, **Ex. 1** at ¶ 2.

5.      Defendant, at all relevant times, was and is a state-related institution of higher education and an instrumentality of the Commonwealth of Pennsylvania, organized and existing under the Not for Profit Corporation Laws of Pennsylvania. Defendant maintains its offices and principal place of business in University Park, Pennsylvania, which is located in Centre County, Pennsylvania. For diversity purposes, Defendant is a citizen of Pennsylvania.

6.      Plaintiff has not named any other defendants in the State Court Action.

7.      The amount in controversy meets the jurisdictional requirements. For example, Plaintiff alleges, *inter alia*, that Defendant has been unjustly enriched at the expense of Plaintiff in the amount of $10 million. Compl. ¶¶ 17, 60. Thus, it is apparent from the face of the Complaint that the amount in controversy is well in excess of $75,000, exclusive of interest and costs.

**This Notice of Removal is Timely and Complete and Has Been Properly Served**

8.      Plaintiff filed his Complaint in the Superior Court of the State of California, Orange County, on April 9, 2024. Without waiving any defenses, including a lack of personal jurisdiction, Defendant accepted service on May 8, 2024, via an executed Notice and Acknowledgement of Receipt. Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b)(1). *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999)

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SPECIALLY APPEARING DEFENDANT THE
PENNSYLVANIA STATE UNIVERSITY'S
NOTICE OF REMOVAL OF ACTION

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

("The U.S. Supreme Court has clarified that the 30-day period does not begin until the plaintiff has effectuated formal service of process.")

9.      Venue is appropriate in that the State Court Action is being removed "to the district court of the United States for the district and division embracing the place where such action is pending," pursuant to 28 U.S.C. § 1441(a). The United States District Court for the Central District of California embraces Orange County, California. 28 U.S.C. § 84(c).

10.     No previous application has been made for the removal requested herein.

11.     Defendant has provided written notice of this Notice of Removal to Plaintiff. A true and complete copy of this Notice of Removal will be filed in the State Court Action.

**<u>Preservation of Rights and Defenses</u>**

12.     All rights are reserved, including, but not limited to, defenses and objections as to venue and personal jurisdiction and the right to move for dismissal of the Complaint for, *e.g.*, failure to state a claim for relief, failure to sue the appropriate parties, forum *non conveniens*, and lack of personal jurisdiction in the forum state. By filing this Notice of Removal, Defendant is not submitting to personal jurisdiction in California in either state or federal court.  The filing of this Notice of Removal is subject to, and without waiver of, any such defenses and objections.

13.     Defendant also reserves the right to amend or supplement this Notice of Removal.

DATED:  June 6, 2024                          SAUL EWING LLP


                                             By:  ___/s/ Dana M. Silva_____
                                                  ALEXANDER R. BILUS
                                                  MATTHEW J. SMITH
                                                  DANA M. SILVA
                                                  Attorneys for Specially Appearing Defendant
                                                  THE PENNSYLVANIA STATE UNIVERSITY

52172650.7

3

SPECIALLY APPEARING DEFENDANT THE
PENNSYLVANIA STATE UNIVERSITY'S
NOTICE OF REMOVAL OF ACTION

# EXHIBIT 1

ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
SCOTT J. LEIPZIG (BAR NO. 192005)
PETER A. GRIFFIN (BAR NO. 306201)
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  sleipzig@allenmatkins.com
       pgriffin@allenmatkins.com

Attorneys for Plaintiff
DONALD G. ABBEY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

Assigned for All Purposes
Judge Scott Steiner

| | |
|---|---|
| DONALD G. ABBEY, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>THE PENNSYLVANIA STATE<br>UNIVERSITY, a Pennsylvania nonprofit<br>corporation; and DOES 1-50, inclusive,<br><br>        Defendants. | Case No.  30-2024-01392676-CU-FR-NJC<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUDULENT**<br>**MISREPRESENTATION;**<br>**(2) NEGLIGENT MISREPRESENTATION;**<br>**(3) INTENTIONAL INTERFERENCE**<br>**WITH CONTRACTUAL RELATIONS;**<br>**(4) UNJUST ENRICHMENT;**<br>**(5) PROMISSORY ESTOPPEL; AND**<br>**(6) DECLARATORY RELIEF** |

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4858-4714-5339.2

COMPLAINT

Plaintiff Donald G. Abbey ("Abbey") alleges as follows:

## SUMMARY OF CLAIMS

1.      This lawsuit concerns Defendant Pennsylvania State University's ("Penn State") blatant attempt to defraud its esteemed alumnus, Abbey, with regard to over $10 million in loans Abbey made for the renovation of a fraternity house on the school's campus.  Despite repeatedly assuring Abbey that it did not have the legal right or intention to take over the subject property—which assurances Abbey relied on in making the loans—Penn State now seeks to force a discounted sale of the property and wipe out Abbey's security interest therein.

## THE PARTIES

2.      Plaintiff Abbey is, and at all times herein mentioned was, an individual doing business in the County of Orange, State of California.

3.      Defendant Penn State is, and at all times herein mentioned was, a nonprofit corporation organized and existing under the laws of the State of Pennsylvania, and doing business in the County of Orange, State of California.

4.      The true names and capacities, whether individual, corporate, associate or otherwise of defendants named as Does 1–50, inclusive, are unknown to Abbey at the present time, and Abbey therefore sues said defendants by such fictitious designations. Abbey shall request leave of court to amend this Complaint to insert the true names and capacities of the fictitiously designated defendants when the same have been ascertained with particularity.  Collectively, the Doe defendants and Penn State are sometimes referred to herein as "Defendants."

5.      Abbey is informed and believes and thereon alleges that each of the Defendants is now, and was at all times mentioned herein, the agent, principal, partner, joint venturer, and/or alter ego of the remaining Defendants, and that all of the acts and conduct herein alleged were performed within the course and scope and in the furtherance of such agency, partnership, joint venture and/or alter ego relationship.

## JURISDICTION AND VENUE

6.      Jurisdiction and venue are appropriate in this Court pursuant to Code of Civil Procedure § 410.10 because the parties to this action conduct business in Orange County, California; a substantial portion of the events and omissions giving rise to Abbey's claims occurred in Orange County, California; the events and omissions caused injury to Abbey in Orange County, California; the agreement setting forth Abbey's interest in the subject property was negotiated and entered into in the State of California and is governed by, construed in and enforced in accordance with the laws of the State of California; and each of the Defendants has sufficient minimum contacts with the State of California to support the exercise of jurisdiction.

## BACKGROUND REGARDING ABBEY

7.      Abbey enrolled at Penn State in 1966.  In addition to being a standout football player during his college tenure, Abbey was initiated into Penn State's Alpha Upsilon Chapter ("Alpha Upsilon") of the Beta Theta Pi fraternity ("General Fraternity") in 1968.

8.      After graduating from Penn State in 1970, Abbey achieved tremendous professional success.  Abbey is the founder and CEO of The Abbey Company, a privately held real estate business he began in 1990.  Several of The Abbey Company's employees are Penn State graduates and alumni of Alpha Upsilon.

9.      In 2003, Penn State awarded Abbey the Distinguished Alumnus award in recognition of his entrepreneurial achievements and service to the university.

## PENN STATE'S REPRESENTATIONS TRIGGER ABBEY'S LOANS

10.      Alpha Upsilon owns the real property, improvements and fixtures located at 220 North Burrowes Road, State College, PA, which served as the chapter's fraternity house (the "Beta House").

11.      Starting in or around 2004, Abbey considered loaning money to Alpha Upsilon for the purpose of repairing, reconstructing, improving, and operating the Beta House.

12.     Prior to making any loan, however, Abbey sought to confirm Penn State's rights and intentions regarding the Beta House.  Specifically, on or about January 19, 2005, Abbey inquired via email to Penn State executives Rodney Kirsch (Senior Vice President for Development and Alumni Relations) ("Kirsch"), and Vicky Triponey (Vice President for Student Affairs) ("Triponey"):

> How does the University remove the Chapter from the Campus, if [Alpha Upsilon] owns the land and building if it fails to keep at 2.5 grade point or adhere to any of the first level of standards, and why would anyone agree to give you that right.  If the University was offering financial grants to the house and became equity investors in the future, it might get the right to be repaid[], but to lose the ability to use the house is too severe for any benefits offered.  You can't really think that anyone is going to sign such a document.  It amounts to a quitclaim deed for right of occupancy unilaterally triggered by the University.  This is a deal killer for me.

13.     Abbey further advised the Penn State executives:

> I know that if the chapter did sign over its rights to you, which it won't, I certainly would not invest any money in PSU's newest dorm.  This right of removal from Campus is aggressive beyond belief to me.  I am not sure that I want to give hundreds of thousands of dollars to Beta with this as its future.

14.     In a response email from Triponey on January 20, 2005, copying Kirsch, Stuart Spisak (Penn State's Special Assistant to the Vice President for Student Affairs) ("Spisak"), and Brad Palmer (Alpha Upsilon's alumni representative) ("Palmer") Triponey assured Abbey:

> Don't break any deals yet ... We have no intention of taking over your house (we have no authority to do so!)  Your interpretation is not at all what we intend or envision.  We really are on the same page/heading in the same direction!

15.     On January 27, 2005, Triponey further assured Abbey via an email copying Kirsch, Spisak, Palmer and Stanley Latta (Penn State's Assistant Vice President for Housing, Food Services and Residence Life) ("Latta"):

> We are NOT proposing we have the right to take over a chapter's land or building . . . that is certainly not possible or desirable.  But presently a chapter (the fraternal organization) does exist at the University at the invitation of the University

and the IFC (or appropriate governing council) and if after a
certain period of time and after an effort to help a chapter to
correct their shortcomings relative to the minimum and
reasonable expectations, they still fail to meet the minimums,
we could and would rescind our invitation to that specific
chapter (but you would still own the house) . . . but our intent
here is to help all of the chapters live up to these basic
expectations (our authority is over the organization not the
property).

16.     On that same day, Triponey sent a related email to Palmer, whom Penn

State's executives were aware was working closely with Abbey on Alpha Upsilon matters.

Latta and Spisak, among others, were copied on the email and the email was later

forwarded to Abbey.  In the email, Triponey wrote:

I did some checking on the terms of the deed with the houses
on campus ... and it is our understanding that the university has
1st right of refusal on the property should you (the fraternity /
alumni / house corp.) CHOOSE to sell the property but we
cannot force you to sell it.  Even if - worst case scenario - your
chapter was uninvited/told they could no longer exist at Penn
State, we have no authority to take over your house.

17.     Based on Penn State's executive's statements, Abbey made a series of loans

to Alpha Upsilon for the purpose of repairing, reconstructing, improving, and operating the

Beta House.  To date, Abbey has loaned Alpha Upsilon over $10 million for this purpose.

18.     On information and belief, Abbey's loans to Alpha Upsilon represent the

largest financial investment in a fraternity nationwide and has funded the largest house

renovation in the history of fraternities in the United States.  The loans supported a

complete roof-to-cellar makeover of the Beta House and impacted every part of the house:

plumbing, electrical, security, floors, walls, ceilings, sprinklers, roofing, bathrooms, study

areas, landscaping, parking, kitchen additions, heating and air-conditioning equipment,

furniture, major appliances and more.

### ABBEY AND ALPHA UPSILON ENTER INTO A FUNDING AGREEMENT

19.     On or about June 6, 2009, Abbey and Alpha Upsilon entered into a written

agreement related to past and future loans from Abbey (the "Funding Agreement").  A true

and correct copy of the Funding Agreement is attached hereto as **Exhibit A** and

incorporated herein by reference.

20.     The Funding Agreement defines two categories of loans:  (a) "Abbey Funds" and (b) "House Improvement Funds."

21.     "Abbey Funds" refer to "funds provided by ABBEY to, for or on behalf of ALPHA UPSILON from and including June 6, 2009."  (Funding Agreement, at § l(c).)

22.     "House Improvement Funds" refer to funds Abbey provided to Alpha Upsilon "for the repair, reconstruction and improvement of the [Beta House]" prior to June 6, 2009.  (*Id.,* Recitals, § B.)  According to the Funding Agreement, Abbey provided $7.7 million to Alpha Upsilon in House Improvement Funds.  (*Id.*)

23.     The Funding Agreement requires Alpha Upsilon to repay to Abbey all of the Abbey Funds, plus interest of 6% per annum, within sixty (60) days of any of the following events:

> a. ALPHA UPSILON decides not to follow the Men of Principle initiative or is determined to be out of compliance by the GENERAL FRATERNITY;
>
> b. ALPHA UPSILON permits, allows or otherwise fails to prevent excessive damage to the [Beta House] as determined by ABBEY and the board of the Abbey Leadership Fund;
>
> c. The [Beta House] is sold to or otherwise acquired by any third party unless agreed to by ABBEY, with repayment to ABBEY limited to available net proceeds from the transaction. To avoid the repayment obligation, ABBEY must agree to any sale or acquisition of the [Beta House].  Any sale or acquisition without ABBEY's agreement will trigger the repayment obligation of Paragraph 3; or
>
> d. ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the [Beta House] is utilized for a purpose other than Alpha Upsilon of Beta Theta Pi unless agreed to by Abbey.
>
> If upon the occurrence of a. or b. above, ALPHA UPSILON does not have sufficient funds to repay ABBEY within 60 days, a lien will be placed on the [Beta House] in favor of ABBEY until the ABBEY FUNDS are repaid.  If upon the occurrence of d, above, meaning that ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the [Beta House] is utilized for a purpose other than Alpha Upsilon of Beta Theta without ABBEY's agreement, ALPHA UPSILON does not have sufficient funds to repay ABBEY within 60 days, a lien will be placed on the [Beta House] in favor of ABBEY until the ABBEY FUNDS are repaid.

1 | (*Id.* at § 3.)

2 |     24.    Interest has accrued on the Abbey Funds in an amount according to proof.

3 |     25.    The Funding Agreement also requires Alpha Upsilon to repay to Abbey all

4 | of the House Improvement Funds within sixty (60) days of any of the following events:

> a. The [Beta House] is sold to or otherwise acquired by any third party unless agreed to by ABBEY, with repayment to ABBEY limited to available net proceeds from the transaction. To avoid the repayment obligation, ABBEY must agree to any sale or acquisition of the [Beta House]. Any sale or acquisition without ABBEY's agreement will trigger the repayment obligation of Paragraph 4; or

> b. ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the [Beta House] is utilized for a purpose other than Alpha Upsilon of Beta Theta Pi unless agreed to by ABBEY.

> If upon the occurrence of b. above, meaning that ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the [Beta House] is utilized for a purpose other than Alpha Upsilon of Beta Theta without ABBEY's agreement, ALPHA UPSILON does not have sufficient funds to repay ABBEY within 60 days, a lien will be placed on the [Beta House] in favor of ABBEY until the ABBEY FUNDS are repaid.

16 | (*Id.* at§ 4.)

## ALPHA UPSILON'S REPAYMENT OBLIGATION BECOMES DUE

18 |     26.    It was Abbey and Alpha Upsilon's intention that the Property would serve as

19 | security for the performance of Alpha Upsilon's repayment obligation under the Funding

20 | Agreement.

21 |     27.    On February 4, 2017, an associate member of Alpha Upsilon succumbed to

22 | injuries sustained as a result of various alcohol-related hazing activities.

23 |     28.    This tragic incident led to additional events that triggered Alpha Upsilon's

24 | repayment obligation under the Funding Agreement.

25 |     29.    On February 15, 2017, the General Fraternity disbanded Alpha Upsilon and

26 | on March 30, 2017, Penn State permanently revoked its recognition of Alpha Upsilon as a

27 | recognized student organization.  The effect of these events is that the Beta House can no

28 | longer be used for the purpose of housing Alpha Upsilon.

30.     Abbey has not agreed to allow the Beta House to be used for any purpose other than housing Alpha Upsilon.

31.     The General Fraternity determined that Alpha Upsilon's involvement in the events surrounding the death of the Alpha Upsilon member violate the General Fraternity's Men of Principle initiative.

32.     Alpha Upsilon has also failed to prevent excessive damage to the Property. Such excessive damage was sustained more than sixty (60) days ago.

33.     Given the occurrence of events triggering Alpha Upsilon's repayment obligation under the Funding Agreement, on March 10, 2017, Abbey filed suit against Alpha Upsilon.  The matter was filed as *Donald G. Abbey v. The Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi, Inc.,* in the Court of Common Pleas of Centre County, Pennsylvania, as Case No. 2017-838 (the "Alpha Upsilon Litigation").

34.     Alpha Upsilon did not repay the Abbey Funds or the House Improvement Funds in connection with the Alpha Upsilon Litigation, and on information and belief, Alpha Upsilon did not have sufficient funds to repay Abbey within 60 days of the above-identified triggering occurrences.  Thus, the Funding Agreement requires that a lien be placed on the Beta House in favor of Abbey until the Abbey Funds and the House Improvement Funds are repaid.

**PENN STATE OBTAINS ORDER FORCING THE SALE OF THE BETA HOUSE**

35.     On December 21, 2021, the Court in the matter *The Pennsylvania State University v. The Alpha Upsilon Chapter of the Fraternity of Beta Theta Pi, Inc*., in the Court of Common Pleas of Centre County, Pennsylvania, Case No. 2018-4608 (the "Penn State Action") issued a verdict in favor of Penn State ("Verdict") and ordered that ownership of the Beta House shall be transferred to Penn State in accordance with the following:

> 2. Once this verdict becomes final, the parties shall have six (6) months to attempt to negotiate a transfer price for the subject property. For these purposes, Defendant shall afford Plaintiff, and any necessary designee of Plaintiff, reasonable access to the subject premises for purposes of appraising the fair market value of the property. The parties may waive the six (6) month

period for negotiation by written agreement and proceed as they may agree, or in the absence of an agreement as to how to proceed, as set forth hereinafter.

3. Following the expiration of the period described in paragraph 2 above, whether by the lapse of time or upon the agreement of the parties, the parties shall have two (2) months to agree upon the number of and identity of the members of a Board of Arbitrators to determine the transfer price of the subject property.

4. If an impasse should arise regarding the number of and/or identity of arbitrators, either party may file a Praecipe for a hearing before the Court where the Court will set the number of arbitrators and/or determine the identity of said arbitrators, as may be necessary. In the event of a future hearing to set the identities of the members of a Board of Arbitrators, each party shall nominate two (2) arbitrators by filing the same with the Prothonotary of Centre County at least ten ( 10) days before the scheduled hearing and serve a copy of said filing on the Court.

36.    The Verdict in the Penn State Action is of critical significance for at least two reasons.

37.    First, it reflects an additional basis upon which Alpha Upsilon's repayment obligation under the Funding Agreement has/will become due:  the sale of the Beta House to a third party (Penn State) without Abbey's consent.

38.    Second, the Verdict gave rise to the claims alleged herein by informing Abbey that Penn State's prior representations to him were false.  Despite repeatedly assuring Abbey that he could safely loan millions of dollars towards the renovation of the Beta House because Penn State supposedly did not have a legal right or an intention to take over the fraternity house, Penn State obtained an order to the contrary.  Abbey did not discover, and could not with reasonable diligence have discovered this fact, prior to the Verdict.

**FIRST CAUSE OF ACTION**

**(Fraudulent Misrepresentation)**

39.     Abbey realleges and incorporates by reference all preceding paragraphs as if set forth in full herein.

40.     Prior to Abbey making any loans to Alpha Upsilon, in January 2005, Penn State executive Triponey made several representations to Abbey, including:

    a.  "We have no intention of taking over your house (we have no authority to do so!)"

    b.  "We are NOT proposing we have the right to take over a chapter's land or building . . . that is certainly not possible or desirable."

    c.  Under certain situations, Penn State "could and would rescind our invitation to that specific chapter (but you would still own the house)."

    d.  "[O]ur authority is over the organization not the property."

41.     Also in January 2005, Triponey represented to Palmer, with whom Abbey was working closely on Alpha Upsilon matters, "[I]t is our understanding that the university has 1st right of refusal on the property should you (the fraternity / alumni / house corp.) CHOOSE to sell the property but we cannot force you to sell it.  Even if - worst case scenario - your chapter was uninvited/told they could no longer exist at Penn State, we have no authority to take over your house."

42.     Abbey is informed and believes that Penn State, through its executives, intentionally misrepresented the fact that Penn State had authority to take over the Beta House and intended to exercise that authority.  Penn State made these misrepresentations in order to induce Abbey to renovate the fraternity house that it would later take over.

43.     Had Abbey been aware that Penn State had authority to take over the Beta House and that it intended to do so, Abbey never would have loaned any funds to Alpha Upsilon.  Indeed, Abbey specifically advised Penn State, "I know that if the chapter did sign over its rights to you, which it won't, I certainly would not invest any money in PSU's

newest dorm.  This right of removal from Campus is aggressive beyond belief to me.  I am not sure that I want to give hundreds of thousands of dollars to Beta with this as its future."

44.     Abbey justifiably relied on Penn State's representations in evaluating whether or not to loan funds to Alpha Upsilon for the renovation of the Beta House.  Because of these representations, Abbey ultimately loaned over $10 million towards the renovation of the Beta House.

45.     Abbey has suffered harm due to his justifiable reliance on the misrepresentations detailed above.  Abbey's reliance on Penn State's representations was a substantial factor in causing his harm.  Accordingly, Abbey seeks damages in an amount to be proven at trial.

46.     In undertaking the actions and conduct described above, Defendants acted with the intention to deceive and defraud Abbey and are guilty of fraud, oppression, and malice.  In addition to actual damages, Abbey is entitled to an award of exemplary and punitive damages against Defendants in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation)

47.     Abbey realleges and incorporates by reference all preceding paragraphs as if set forth in full herein.

48.     Prior to Abbey making any loans to Alpha Upsilon, in January 2005, Penn State executive Triponey made several representations to Abbey, including:

    a.  "We have no intention of taking over your house (we have no authority to do so!)"

    b.  "We are NOT proposing we have the right to take over a chapter's land or building . . . that is certainly not possible or desirable."

    c.  Under certain situations, Penn State "could and would rescind our invitation to that specific chapter (but you would still own the house)."

    d.  "[O]ur authority is over the organization not the property."

49.     Also in January 2005, Triponey represented to Palmer, with whom Abbey was working closely on Alpha Upsilon matters, "[I]t is our understanding that the university has 1st right of refusal on the property should you (the fraternity / alumni / house corp.) CHOOSE to sell the property but we cannot force you to sell it.  Even if - worst case scenario - your chapter was uninvited/told they could no longer exist at Penn State, we have no authority to take over your house."

50.     Abbey is informed and believes that Penn State had no reasonable grounds for believing the above representations were true when made.  Penn State made these misrepresentations in order to induce Abbey to renovate the fraternity house that it would later take over.

51.     Had Abbey been aware that Penn State had authority to take over the Beta House and that it intended to do so, Abbey never would have loaned any funds to Alpha Upsilon.  Indeed, Abbey specifically advised Penn State, "I know that if the chapter did sign over its rights to you, which it won't, I certainly would not invest any money in PSU's newest dorm.  This right of removal from Campus is aggressive beyond belief to me.  I am not sure that I want to give hundreds of thousands of dollars to Beta with this as its future."

52.     Abbey justifiably relied on Penn State's representations in evaluating whether or not to loan funds to Alpha Upsilon for the renovation of the Beta House. Because of these representations, Abbey ultimately loaned over $10 million towards the renovation of the Beta House.

53.     Abbey has suffered harm due to his justifiable reliance on the misrepresentations detailed above.  Abbey's reliance on Penn State's representations was a substantial factor in causing his harm.  Accordingly, Abbey seeks damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Intentional Interference With Contractual Relations)

54.     Abbey realleges and incorporates by reference all preceding paragraphs as if set forth in full herein.

55.     As alleged herein, Abbey and Alpha Upsilon are parties to the Funding Agreement, which is a valid and enforceable contract.

56.     Penn State was aware of the contract between Abbey and Alpha Upsilon.

57.     Despite this knowledge, Penn State engaged in the conduct alleged herein which prevented performance under the Funding Agreement and/or made performance more expensive or difficult.  Penn State intended to disrupt the performance under the Funding Agreement or, at a minimum, engaged in such conduct knowing that disruption of performance was certain or substantially certain to occur.

58.     Abbey has suffered and will suffer additional harm, including the loss of security for his over $10 million loan to Alpha Upsilon.  Penn State's conduct was a substantial factor in causing Abbey's harm.  Accordingly, Abbey seeks damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

59.     Abbey realleges and incorporates by reference all preceding paragraphs as if set forth in full herein.

60.     As a result of the foregoing misconduct, Penn State has been unjustly enriched at the expense of Abbey.  Penn State's unjust enrichment includes, among other things, its receipt of the benefits of Abbey's $10 million loan towards the renovation of the Beta House.  Penn State has retained said benefits despite Abbey's demands that they be returned.

61.     As a direct and proximate result of Penn State's conduct, Abbey has suffered and will suffer additional harm in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Promissory Estoppel)

62.     Abbey realleges and incorporates by reference all preceding paragraphs as if set forth in full herein.

63.     Prior to Abbey making any loans to Alpha Upsilon, in January 2005, Penn State executive Triponey made several clear and unambiguous promises to Abbey, including:

    a.   "We have no intention of taking over your house (we have no authority to do so!)"

    b.   "We are NOT proposing we have the right to take over a chapter's land or building . . . that is certainly not possible or desirable."

    c.   Under certain situations, Penn State "could and would rescind our invitation to that specific chapter (but you would still own the house)."

    d.   "[O]ur authority is over the organization not the property."

64.     Also in January 2005, Triponey expressly promised to Palmer, with whom Abbey was working closely on Alpha Upsilon matters, "[I]t is our understanding that the university has 1st right of refusal on the property should you (the fraternity / alumni / house corp.) CHOOSE to sell the property but we cannot force you to sell it.  Even if - worst case scenario - your chapter was uninvited/told they could no longer exist at Penn State, we have no authority to take over your house."

65.     Abbey reasonably and justifiably relied on Penn State's promises in evaluating whether or not to loan funds to Alpha Upsilon for the renovation of the Beta House.  Because of Penn State's promises, Abbey ultimately loaned over $10 million towards the renovation of the Beta House.

66.     Abbey has suffered harm due to his reasonable and justifiable reliance on the promises detailed above.  Abbey's reliance on Penn State's promises was a substantial factor in causing his harm.  Accordingly, Abbey seeks damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Declaratory Relief)

67.     Abbey realleges and incorporates by reference all preceding paragraphs as if set forth in full herein.

68.     An actual and existing controversy has arisen and now exists between Abbey and Penn State with respect to the following:

a.  Whether Penn State is precluded from purchasing the Beta House in light of Abbey's lien on the Beta House;

b.  Whether Penn State is precluded from purchasing the Beta House in light of Penn State's wrongful conduct alleged herein; and

c.  If Penn State is allowed to proceed with the purchase of the Beta House, whether Abbey has a right to participate in: (i) the negotiation of the transfer price for the Beta House; (ii) the process of deciding the number and identity of the members of a Board of Arbitrators to determine the transfer price of the Beta House; and (iii) the eventual arbitration between Penn State and Alpha Upsilon regarding the transfer price for the Beta House.

69.     Abbey is informed and believes, and thereon alleges, that Penn State disputes each and every contention set forth in Paragraph 68, above.

70.     A judicial declaration is therefore necessary and appropriate to determine the above-alleged disputes and to fully resolve the disputes as between the parties.

## **PRAYER**

WHEREFORE, Abbey prays for judgment against Penn State, as follows:

1.      For monetary damages according to proof, but not less than the jurisdictional minimum of this Court, and interest thereon;

2.      For an award of exemplary and punitive damages;

3.      For a declaration of the rights and obligations of the parties, including as follows:

a.  Penn State is precluded from purchasing the Beta House in light of Abbey's lien on the Beta House; and/or

b.  Penn State is precluded from purchasing the Beta House in light of Penn State's wrongful conduct alleged herein; or

1          c.   Abbey shall have the right to participate in: (i) the negotiation of the transfer

2                price for the Beta House; (ii) the process of deciding the number and identity

3                of the members of a Board of Arbitrators to determine the transfer price for

4                the Beta House; and (iii) the eventual arbitration between Penn State and

5                Alpha Upsilon regarding the transfer price for the Beta House.

6    4.   For costs of suit incurred herein; and

7    5.   For such other and further relief as the Court may deem just and proper.

9 Dated:  April 9, 2024

ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
SCOTT J. LEIPZIG
PETER A. GRIFFIN

By: _____
SCOTT J. LEIPZIG
Attorneys for Plaintiff
DONALD G. ABBEY

# EXHIBIT A

**FUNDING AGREEMENT**

This Funding Agreement (hereinafter referred to as "this Agreement") is entered into as of June 6, 2009, by and among DONALD G. ABBEY (hereinafter referred to as "ABBEY") on the one hand, and the ALPHA UPSILON CHAPTER OF THE FRATERNITY OF BETA THETA PI, INC. (hereinafter referred to as "the CORPORATION") on the other hand. The CORPORATION owns as its primary asset the real property, improvements and fixtures commonly known as 220 North Burrowes Street, State College, Pennsylvania (hereinafter referred to as "the HOUSE"). Together, the CORPORATION and the HOUSE shall be referred to hereinafter as "ALPHA UPSILON." Together, ABBEY and the CORPORATION shall be referred to hereinafter as "the PARTIES."

## RECITALS

A.     WHEREAS, ABBEY and the CORPORATION agree that the HOUSE shall be obligated to Alpha Upsilon of Beta Theta Pi;

B.     WHEREAS, ABBEY has previously provided approximately $7.7 million in funds to ALPHA UPSILON for the repair, reconstruction and improvement of the HOUSE (hereinafter referred to as "the HOUSE IMPROVEMENT FUNDS");

C.     WHEREAS, the BETA THETA PI FOUNDATION AND ADMINISTRATIVE OFFICE (hereinafter referred to as "the GENERAL FRATERNITY") disbanded ALPHA UPSILON in or about the Spring of 2009;

D.     WHEREAS, ALPHA UPSILON desires to re-colonize the HOUSE pursuant to the GENERAL FRATERNITY's Men of Principal initiative, which requires that Jeff Rundle of the GENERAL FRATERNITY live in the HOUSE for at least one year for recruitment and compliance purposes;

E.     WHEREAS, ALPHA UPSILON will incur expenses and costs associated with its re-colonization of the HOUSE and compliance with the Men of Principal initiative which could total more or less $250,000 annually over two to three years;

F.     WHEREAS, ALPHA UPSILON intends to raise funds to meet these expenses through the Howard Walton Mitchell Fund and on a longer term basis through contributions to the Abbey Leadership Foundation; and

G.     WHEREAS, to the extent that ALPHA UPSILON is unable to raise sufficient funds, ABBEY is willing to provide funds to ALPHA UPSILON to meet its expenses and costs,

IT IS HEREBY AGREED by and between the PARTIES as follows:

1

## **AGREEMENT**

1.    **Consideration**.

    a.    Subject to his sole discretion, ABBEY will agree to provide funds to, for, for the benefit of, for the use of or on behalf of ALPHA UPSILON, either directly or indirectly, as required for the operations of the HOUSE, Mr. Rundle's salary for at least one year and costs associated with his recruiting efforts and implementation of the Men of Principle initiative, capital improvements, operational improvements and other related expenses;

    b.    Subject to his sole discretion, ABBEY may also provide additional funds to, for, for the benefit of, for the use of or on behalf of ALPHA UPSILON, either directly or indirectly;

    c.    Collectively, all funds provided by ABBEY to, for or on behalf of ALPHA UPSILON from and including June 6, 2009, shall be referred to hereinafter as "the ABBEY FUNDS."

    d.    In exchange for the ABBEY FUNDS, ALPHA UPSILON will do each of the following:

        i.    Adopt, implement and at all times comply with the requirements of the Men of Principle initiative;

        ii.    Re-colonize the HOUSE;

        iii.    Submit as necessary to the requirements of the GENERAL FRATERNITY to ensure compliance with the Men of Principle initiative; and

        iv.    Submit written budgets to ABBEY of all expenses and costs for which it requests funding within 60 days of the execution of this Agreement and annually thereafter.

2.    **Agreement Term**.  This Agreement will expire 10 years after execution.

3.    **Repayment Obligation**.  ALPHA UPSILON will within 60 days repay all of the ABBEY FUNDS to ABBEY, plus interest of 6% per annum, upon the occurrence of any of the following during the term of this Agreement:

    a.    ALPHA UPSILON decides not to follow the Men of Principle initiative or is determined to be out of compliance by the GENERAL FRATERNITY;

2

b.      ALPHA UPSILON permits, allows or otherwise fails to prevent excessive damage to the HOUSE as determined by ABBEY and the board of the Abbey Leadership Fund;

c.      The HOUSE is sold to or otherwise acquired by any third party unless agreed to by ABBEY, with repayment to ABBEY limited to available net proceeds from the transaction.  To avoid the repayment obligation, ABBEY must agree to any sale or acquisition of the HOUSE.  Any sale or acquisition without ABBEY's agreement will trigger the repayment obligation of Paragraph 3; or

d.      ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the HOUSE is utilized for a purpose other than Alpha Upsilon of Beta Theta Pi unless agreed to by ABBEY.

If upon the occurrence of a. or b. above, ALPHA UPSILON does not have sufficient funds to repay ABBEY within 60 days, a lien will be placed on the HOUSE in favor of ABBEY until the ABBEY FUNDS are repaid.  If upon the occurrence of d. above, meaning that ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the HOUSE is utilized for a purpose other than Alpha Upsilon of Beta Theta Pi without ABBEY's agreement, ALPHA UPSILON does not have sufficient funds to repay ABBEY within 60 days, a lien will be placed on the HOUSE in favor of ABBEY until the ABBEY FUNDS are repaid.

4.      **Additional Repayment Obligation**.  In addition to the repayment obligation set forth in Paragraph 3, above, ALPHA UPSILON will within 60 days repay to ABBEY the HOUSE IMPROVEMENT FUNDS (actual amount subject to audit) upon the occurrence of any of the following during the term of this Agreement:

a.      The HOUSE is sold to or otherwise acquired by any third party unless agreed to by ABBEY, with repayment to ABBEY limited to available net proceeds from the transaction.  To avoid the repayment obligation, ABBEY must agree to any sale or acquisition of the HOUSE.  Any sale or acquisition without ABBEY's agreement will trigger the repayment obligation of Paragraph 4; or

b.      ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the HOUSE is utilized for a purpose other than Alpha Upsilon of Beta Theta Pi unless agreed to by ABBEY.

If upon the occurrence of b. above, meaning that ALPHA UPSILON ceases to be a chapter of the GENERAL FRATERNITY and the HOUSE is utilized for a purpose other than Alpha Upsilon of Beta Theta Pi without ABBEY's agreement, ALPHA UPSILON does not have sufficient funds to repay ABBEY within 60 days, a lien will be placed on the HOUSE in favor of ABBEY until the HOUSE IMPROVEMENT FUNDS are repaid.

3

5. **Repayment Waiver**. If none of the conditions triggering the repayment obligations set forth in Paragraphs 3 and 4 occur during the term of this Agreement, ABBEY will waive all repayment obligations upon the expiration of the term of this Agreement.

6. **No Assignment**. This Agreement is made specifically for the benefit of ALPHA UPSILON and cannot be assigned by ALPHA UPSILON.

7. **Personal Liability**. This agreement in no way implies or creates a personal obligation or liability to any member of the Alumni Board of Beta Theta Pi, Alpha Upsilon Chapter.

8. **Benefit and Burden**. This Agreement shall be binding upon and inure to the benefit of the PARTIES and their respective heirs, representatives, successors and assigns. This does not impose any personal liability to any member of the Alumni Board of Beta Theta Pi, Alpha Upsilon Chapter or their heirs, representatives, successors and assigns.

9. **Waiver and Amendment**. No breach of any provision hereof can be waived unless in writing. Waiver of any one breach of any provision hereof shall not be deemed to be a waiver of any other breach of the same or any other provision hereof. This Agreement may be amended only by a written agreement executed by the PARTIES in interest at the time of the amendment.

10. **Captions and Interpretations**. Titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or any provision thereof. Whenever the context hereof shall so require, the singular shall include the plural, and male gender shall include the female gender and the neuter, and vice-versa. Furthermore, no provision in this Agreement is to be interpreted for or against any party because that party or his legal representative drafted such provision.

11. **Authority to Execute**. The PARTIES, and each of them, represent and warrant that they are competent to enter into this Agreement and have the full right, power and authority to enter into and perform the obligations under this Agreement.

12. **No Prior Assignment**. The PARTIES, and each of them, represent and warrant that they have not assigned, transferred, conveyed or granted, or purported to assign, transfer, convey or grant, any obligation or benefit conferred in this Agreement to anyone.

13 **Integration**. This Agreement constitutes the entire, final and integrated agreement between the PARTIES pertaining to the subject matter hereof and fully supersedes all prior understandings, representations, warranties and agreements between the PARTIES, or any of them, pertaining to the subject matter hereof and may be

modified only by written agreement signed by all of the PARTIES in interest at the time of the modification.

14. **Severance**. If any provision of this Agreement is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, such provision will be deemed to be severed and deleted from the Agreement as a whole, and neither such provision nor its severance and deletion shall in any way affect the validity of the remaining provisions of the Agreement.

15. **No Reliance**. The PARTIES, and each of them, represent and declare that in executing this Agreement, they rely solely upon their own judgment, belief and knowledge, and that they have not been influenced to any extent whatsoever in executing the same by any of the PARTIES or by any person representing them, or any of them.

16. **Counsel**. The PARTIES, and each of them, further acknowledge and represent that they have been given an opportunity to consult and be represented by, and have consulted and been represented by, attorneys of their own choice in connection with the execution of this Agreement, and have relied upon the advice of such attorneys in executing this Agreement.

17. **Voluntary Agreement**. The PARTIES, and each of them, further represent and declare that they have carefully read this Agreement and know the contents thereof, and that they signed the same freely and voluntarily.

18. **Attorney's Fees**. In any action arising out of or related to this Agreement, each prevailing party shall recover his or its reasonable attorney's fees and all expenses related to the action, including, but not limited to, expert consultant and witness fees and statutory costs.

19. **Governing Law**. This Agreement has been negotiated and entered into in the State of California, and shall be governed by, construed in and enforced in accordance with the internal laws of the State of California, without regard to provisions concerning choice or conflict of law.

20. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument and may be executed and delivered by e-mail or facsimile.

Alpha Upsilon Chapter of the
Fraternity of Beta Theta Pi, Inc.

Donald G. Abbey

By: Dan Wilhelm
Its: President

5